IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA,          §
                                   §
            Plaintiff,             §
                                   §
v.                                 §          CRIMINAL NUMBER H-09-512
                                   §
NORRIS FITZGERALD KELLEY           §
and EZEKIEL REED HOLLAND,          §
                                   §
            Defendants.            §

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the court are (1) defendant Ezekiel Reed
Holland's Motion to Suppress the Firearms (Docket Entry No. 86) and
defendant Norris Fitzgerald Kelley's Motion to Suppress Evidence
(Docket Entry No. 89), pursuant to which the defendants seek to
suppress evidence recovered from the vehicle in which Holland and
Kelley were traveling on October 31, 2008, and that was searched
without a warrant; (2) Kelley's Motion to Suppress (Docket Entry
No. 90) and Kelley's Supplemental Motion to Suppress Search Warrant
(Docket Entry No. 95), pursuant to which Kelley seeks to suppress
the warrant that permitted the search of his residence and evidence
seized from his residence; (3) Holland's Motion to Suppress Oral
Statements (Docket Entry No. 87), pursuant to which Holland seeks
to suppress statements he made to police officers during a
custodial interrogation; and (4) Holland's Motion to Sever the

Felon-in-Possession Count (Docket Entry No. 85).  On November 3, 2010, the court conducted an evidentiary hearing at which the United States and the defendants presented evidence.  The court has carefully considered the evidence and the parties' motions and briefing.  For the reasons stated below, the court will grant the defendants' motions to suppress evidence seized from the vehicle, and will deny Kelley's motion concerning the search of his residence, Holland's motion to suppress his oral statements, and Holland's motion to sever.

## I.   Factual and Procedural Background

### A.   Underlying Facts

Officers Robert Oppermann, Abraham Vanderberry, and Sidney Veliz of the Houston Police Department (HPD); Officer Sherwin Sanders of the Texas Department of Public Safety (DPS); Officers Bryan Baker and Scott Newton of the Fort Bend County Sheriff's Department; and Defendant Ezekiel Holland testified at the suppression hearing held on November 3, 2010.  The testimony of these witnesses and the exhibits presented at the hearing lead the court to conclude the following:

### 1.   Holland's Arrest and the Search of the Vehicle

On October 31, 2008, Officers Oppermann and Novak, members of a specialized tactical unit within HPD, were assigned to provide assistance to a High-Intensity Drug Trafficking Area (HIDTA) task

force unit on the west side of Houston.[1]   The HIDTA unit had
arranged a narcotics transaction according to which a Confidential
Informant (CI) was to sell a large amount of cocaine to the two
defendants, Holland and Kelley.[2]   Around mid-day the defendants
were engaged in negotiations with the CI, and Oppermann and Novak
were in a marked police vehicle stationed close by but out of sight
listening as the undercover HIDTA officers related the details of
the negotiations over the HIDTA radio.[3]   The defendants briefly
left the proposed transaction site to drive to Kelley's residence
south of Houston, and were observed carrying a bag from the
residence and placing the bag in the vehicle before returning to
the proposed transaction site.[4]

Eventually, Oppermann and Novak received notification from the
HIDTA unit that the defendants had broken off the negotiations and
were driving east on Bellaire Avenue toward the position where
Oppermann and Novak were stationed.[5]   The HIDTA officers were
concerned that the defendants planned to rob the CI of the
narcotics, so they instructed Oppermann and Novak to pull over the
defendants' vehicle when they had probable cause to do so.[6]   The

---

[1]Tr. of Suppression Hr'g, Docket Entry No. 110, p. 8:1–25.

[2]See id. at 10:1–11:19.

[3]See id. at 8:22–11:12.

[4]Id. at 12:13–21, 21:24–22:14.

[5]Id. at 38:24–39:5.

[6]Id. at 14:1–23, 33:10–19, 50:6–7, 41:4–9, 59:1–13.

defendants were traveling in a black GMC Yukon, with Holland in the driver's seat and Kelley in the front passenger seat, and were in the far-right lane heading toward the intersection of Bellaire and the Sam Houston Tollway, a major highway.[7]  Once the defendants passed Oppermann and Novak's position, Oppermann, along with some of the HIDTA officers, observed the defendants' vehicle move, without signaling, from the far-right lane into the center lane, and then from the center lane into the far-left lane.[8]

Having observed the defendants change lanes without signaling in violation of Texas law, see Tex. Transp. Code § 545.104(a), Oppermann pulled out onto Bellaire, caught up to the defendants' vehicle, and initiated a traffic stop by activating the vehicle's emergency equipment.[9]  Officer Oppermann testified that the only basis for stopping the defendants' vehicle was the traffic violation, and that at the time of the traffic stop he had no factual basis, either from his own observations or from other officers' statements, to conclude that any narcotics were in the vehicle, that the defendants had displayed any cash or currency during the negotiations or that any cash or currency was in the defendants' vehicle, that the defendants had made any threats to the CI or to any other officer, or that the defendants had

---

[7]Id. at 14:7-10, 41:17-25, 79:14-19.

[8]Id. at 47:20-21, 55:1-56:8.

[9]Id. at 14:1-15:5, 49:6-7, 55:1-56:9, 60:19-61:7.

committed any other acts that amounted to probable cause.[10]  When
Oppermann activated the police vehicle's emergency equipment the
defendants were making a left turn onto the highway frontage road.[11]
Looking through the Yukon's rear tinted window, Oppermann observed
both defendants making "furtive movements" towards the vehicle's
center console before the defendants turned on a side street and
into the parking lot of a shopping center.[12]

Once the defendants' vehicle was stopped Officers Oppermann
and Novak ordered the defendants out of the vehicle and handcuffed
them.[13]  Holland was arrested for the misdemeanor traffic offense
of failing to signal a lane change and was detained in one police
vehicle,[14] while Kelley, although not charged with a specific
offense, was detained in another police vehicle.[15]  Approximately
five officers were present at the scene.[16]  After the defendants
were detained Oppermann returned to the Yukon, opened the center
console and discovered two handguns.[17]  Oppermann testified that the
search was made incident to Holland's arrest for the traffic

---

[10]Id. at 60:8-22, 78:19-79:5, 81:19-82:17.

[11]Id. at 61:1-11.

[12]Id. at 61:1-17, 63:12-64:13, 73:3-17.

[13]Id. at 18:8-15, 108:20-24.

[14]Id. at 95:23-96:5.

[15]Id. at 101:10-21, 108:20-24.

[16]See id. at 97:1-4.

[17]Id. at 21:1-12.

violation and was not an inventory search.[18]  Oppermann then searched the rest of the vehicle and found the bags the defendants had retrieved from Kelley's residence, which contained clothes and candy.[19]

2.  The Search of Kelley's Residence

Later in the afternoon of October 31, 2008, at Kelley's residence, the HIDTA unit contacted the Fort Bend County Narcotics Task Force to request assistance from a certified K-9 team, which consists of a drug-detection dog and the dog's handler.[20]  Officer Newton and his dog, "Mike," responded to the request.[21]  Mike had been trained to detect the odor of marijuana, cocaine, heroin, and methamphetamine, and to sit when he smelled one of those odors.[22]  Officer Newton walked Mike up the driveway outside Kelley's residence to the left side of the garage.[23]  Officer Newton testified that Mike pulled him "towards the seam of the garage door," sniffed along the seam, and sat, indicating that he had smelled a narcotics odor.[24]

---

[18]Id. at 98:8-11, 100:23-25.

[19]Id. at 21:15-22:11.

[20]Id. at 141:21-143:20.

[21]Id.

[22]Id. at 143:12-145:3.

[23]Id. at 145:10-19.

[24]Id. at 145:12-146:10.

Officer Veliz of the HIDTA unit then contacted Officer Baker of the Fort Bend County Sheriff's Department for assistance in obtaining a search warrant for Kelley's residence.[25]   The two officers met to discuss the factual basis for a warrant, including the fact that the K-9 team had detected a narcotics odor at the seam of Kelley's garage door.[26] Officer Baker prepared an affidavit and a search warrant and presented them to a magistrate judge at the Fort Bend County Courthouse who reviewed the documents, asked Officer Baker if the information was true and correct, and signed the warrant.[27]   The search warrant was executed, resulting in the discovery of, among other things, a cocaine "kilo press," a handgun, an assault rifle, and twenty-seven bundles of cash.[28]

###    3.   May 6, 2009, Interrogations of Defendants

Several months later, on May 6, 2009, the defendants were arrested for possession with intent to distribute six kilograms of cocaine.[29] State law enforcement officers questioned each defendant

---

[25]Id. at 129:15–130:11.

[26]Id. at 130:2–18; Affidavit for Search Warrant, Exhibit A to United States' Response to Defense Motion to Suppress Search Warrant, Docket Entry No. 93, p. 5.

[27]Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 130:9–133:25.

[28]Id. at 159:17–160:22; Search Warrant Return and Inventory, Exhibit A to United States' Response to Defense Motion to Suppress Search Warrant, Docket Entry No. 93, p. 2.

[29]Motion to Suppress Oral Statements, Docket Entry No. 87, p. 1.

separately and recorded the conversations.   The parties do not dispute that these interviews were custodial interrogations.[30]   The transcript for Holland's recorded interrogation does not reflect that an officer advised Holland of his <u>Miranda</u> rights.   Officer Sanders, one of the officers who questioned both defendants, testified that he simply forgot to turn on the microcassette for the beginning portion of the interrogation, when he informed Holland of his <u>Miranda</u> rights.[31]   Officer Vanderberry was in the room during Holland's interrogation and his testimony at the suppression hearing corroborated Officer Sanders' account.[32] Holland testified that no officer ever informed him of his <u>Miranda</u> rights or asked him to waive those rights.

**B.   Procedural History**

On September 2, 2009, Holland and Kelley were indicted for conspiracy to possess with intent to distribute a controlled substance on or about October 31, 2008 (Count One), and each defendant was separately indicted for possession of a firearm in furtherance of a drug-trafficking crime and for being a felon in possession of a firearm (Counts Two through Four).[33]   The Second

---

[30]Tr. of Suppression Hr'g, Docket Entry No. 110, p. 115:1-7.

[31]Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 112:22-113:9.

[32]<u>Id.</u> at 125:11-126:2.

[33]Indictment, Docket Entry No. 1, pp. 1-3.

Superseding Indictment, filed September 15, 2010, includes these five offenses and also charges both defendants with possession of a controlled substance with intent to distribute (Count Six), which arises from events that occurred on May 6, 2009.[34]  On October 15, 2010, Holland moved to sever the felon-in-possession count and to suppress both the evidence seized in the vehicle on October 31, 2008, and the oral statements he made to the police during his interrogation on May 6, 2009.[35]  On October 20, 2010, Kelley moved to suppress the evidence seized from the vehicle, the search warrant permitting a search of his residence, and any evidence seized from his residence.[36]  Kelley supplemented his motion to suppress the search warrant on November 3, 2010.[37]  A suppression hearing was held on November 3, 2010, at which the United States and the defendants presented evidence.  The parties subsequently submitted supplemental briefs in support of their pleadings.

---

[34]Second Superseding Indictment, Docket Entry No. 68.

[35]Motion to Sever the Felon-in-Possession Count ("Motion to Sever"), Docket Entry No. 85; Holland's Motion to Suppress the Firearms, Docket Entry No. 86; Holland's Motion to Suppress Oral Statements, Docket Entry No. 87.

[36]Kelley's Motion to Suppress Evidence ("Kelley's Motion to Suppress Regarding the Traffic Stop"), Docket Entry No. 89; Kelley's Motion to Suppress ("Kelley's Motion to Suppress Regarding His Residence"), Docket Entry No. 90.

[37]Kelley's Supplemental Motion to Suppress Search Warrant, Docket Entry No. 95.

## II.   The Motions to Suppress Evidence Seized from the Vehicle

### A.   Standard of Review

Generally, the defendant bears the burden of proving, by a preponderance of the evidence, that the evidence at issue was obtained in violation of his constitutional rights.   See United States v. Guerrero-Barajas, 240 F.3d 428, 432 (5th Cir. 2001), cert. denied, 122 S. Ct. 919 (2002).   The burden of proof shifts to the government, however, when the search at issue was conducted without a warrant.   Id.   Therefore, with respect to the motions to suppress evidence seized from the vehicle, the government bears the burden of proving, by a preponderance of the evidence, that the search was constitutional.   Id.

### B.   Analysis

"The Fourth Amendment provides that '[t]he right of the people to be free in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .'" Bond v. United States, 120 S. Ct. 1462, 1464 (2000) (quoting U.S. CONST. amend. IV).   The defendants argue that any evidence seized from the Yukon should be suppressed because (1) the officers were not justified in stopping the vehicle; and (2) the search of the center console was not justified by a warrant, consent, or probable cause, or authorized by an exception to the Fourth Amendment's search-and-seizure requirements.[38]   The government contends that

---

[38]See Defendant Holland's Brief in Support of the Motion to Suppress the Firearms (Doc. 86) and the Motion to Suppress Oral
(continued...)

(1) the traffic stop and subsequent detentions were lawful because the defendants committed a traffic violation; and (2) the search was lawful as a search incident to an arrest, or alternatively, that the evidence is admissible under the "good-faith reliance" rule and the "inevitable-discovery" rule.[39]

### 1. The Traffic Stop Was Lawful

"The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). A traffic stop is thus "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren v. United States, 116 S. Ct. 1769, 1772 (1996). A police officer's decision to conduct a traffic stop is "reasonable" if the officer has probable cause to believe that the driver committed a traffic violation. Id. at 1777. A "brief, investigatory" traffic stop — a so-called "Terry stop" — may also be reasonable, even if probable cause is lacking, if the officer has a "reasonable, articulable suspicion" that "criminal activity is afoot." Illinois v. Wardlow, 120 S. Ct. 673, 675 (2000) (citing Terry v. Ohio, 88 S. Ct. 1868, 1884

---

[38](...continued)
Statements (Doc. 87) ("Holland's Brief"), Docket Entry No. 115, p. 2; Norris Fitzgerald Kelley's Omnibus Brief in Support of Motion to Suppress Evidence ("Kelley's Brief"), Docket Entry No. 114, pp. 11-17.

[39]United States' Additional Briefing in Opposition to Suppression, Docket Entry No. 117, pp. 1-10.

(1968)); see Alabama v. White, 110 S. Ct. 2412, 2416-17 (categorizing an officer's decision to pull over a vehicle as a Terry stop).   But whether justified by probable cause or a reasonable suspicion, the Fifth Circuit examines the legality of a traffic stop under Terry's two-pronged analysis.[40]   Brigham, 382 F.3d at 506.   First, the court examines whether the officer's decision to stop the vehicle was justified at its inception. United States v. Pack, 612 F.3d 341, 358 (5th Cir. 2010) (citing Brigham, 382 F.3d at 506).   Second, the court determines whether the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle.   Id.

The court concludes that the government has met its burden to prove that the initial stop of the vehicle was proper.   Officer

---

[40]The court notes the potential confusion that may arise from applying the same analysis for traffic stops based on probable cause as for those based on reasonable suspicion, since each basis is governed by a different Fourth Amendment standard with respect to the types of law-enforcement conduct that are permitted.   See, e.g., Atwater v. City of Lago Vista, 121 S. Ct. 1536, 1557 (2001) (explaining that an officer was authorized to make a custodial arrest of a defendant because the officer had probable cause to believe that the defendant was not wearing a seatbelt); id. at 1554 n.16 (noting that "Terry certainly supports a more finely tuned approach to the Fourth Amendment when police act without the traditional justification that . . . probable cause . . . provides"); United States v. Robinson, 94 S. Ct. 467, 473 (1973) (differentiating the types of law-enforcement conduct that are permitted by Terry from those that are justified by probable cause).   The Fifth Circuit raised this issue in Brigham but did not explore it since the government did not contend that the stop was based on probable cause.   Brigham, 382 F.3d at 506 n.4.   See also Berkemer v. McCarty, 104 S. Ct. 3138, 3150 n.29 (1984) ("We of course do not suggest that a traffic stop supported by probable cause may not exceed the bounds set by the Fourth Amendment on the scope of a Terry stop.").

Oppermann saw the defendants' vehicle drive by the location at which he was positioned along Bellaire Avenue, and as the defendants continued eastbound, Oppermann watched as Holland moved the vehicle across two lanes without signaling.[41]   A traffic stop is justified if an officer has probable cause to believe a driver committed a traffic violation.  See Whren, 116 S. Ct. at 1772. Probable cause is defined as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 204 (5th Cir. 2009) (quoting Michigan v. DeFillippo, 99 S. Ct. 2627, 2632 (1979)).  Oppermann had probable cause, based on his observations, to stop the defendants' vehicle for failing to use a signal when changing lanes.  See Tex. Transp. Code Ann. § 545.104(a) (West 1999).

Holland argues that the government's version of events is implausible because the offense report, which states that Holland changed lanes in an unsafe manner, see Tex. Transp. Code Ann. § 545.103, is inconsistent with Oppermann's testimony that Holland changed lanes without signaling, see id. § 545.104.[42]  Holland also argues that Oppermann's testimony that he observed first hand

_____

[41]See Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 14:11-12, 15:2-5, 39:18-25, 40:18-23, 41:4-9, 47:20-49:10.

[42]Holland's Brief, Docket Entry No. 115, pp. 2-4.

Holland's improper lane change is not credible.[43]   The court disagrees.   At the suppression hearing Oppermann credibly testified, with the aid of maps and photographs, that he watched the black Yukon in which the defendants were traveling drive east on Bellaire and that he witnessed the vehicle move from the far-right lane to the far-left lane without signaling.   The significance of Oppermann's credible in-court explanation outweighs the significance, if any, that could be attributed to the minor inconsistency found in the offense report, which was authored by someone other than Oppermann and is therefore a second-hand account of what transpired.[44]

>    2.   The Search of the Vehicle Was Not a Valid Search Incident to Arrest

The court next considers whether the officers' subsequent actions were reasonably related in scope to the circumstances that caused them to initially conduct the traffic stop.   Oppermann and Novak's subsequent actions were to order the defendants out of the vehicle, secure them in handcuffs, execute a protective patdown for weapons, and place them in the back of separate squad cars.[45]   It appears that Holland was immediately arrested for the traffic

---

[43]Id. at 4-5.

[44]See Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 25:16–26:12.   Because the evidence shows there was probable cause to conduct the traffic stop based on the traffic violation, the court need not consider whether the stop could also be justified as an investigative Terry stop.

[45]Id. at 18:23-20:23, 94:1-97:22, 108:20-24.

violation and Kelley was detained as a safety precaution.[46]   The
parties do not dispute the legality of these actions.   See Atwater
v. City of Lago Vista, 121 S. Ct. 1536, 1557 (2001) ("If an officer
has probable cause to believe that an individual has committed even
a very minor criminal offense in his presence, he may, without
violating the Fourth Amendment, arrest the offender."); Arizona v.
Johnson, 129 S. Ct. 781, 786-87 (2009) (reviewing Terry and its
progeny and affirming the legality of a Terry stop, an officer
ordering a driver and passengers out of the vehicle, and a
protective patdown of both the driver and the passenger).

    After the defendants were removed from the vehicle and
detained, Oppermann searched the Yukon's center console and

----

        [46]Id. at 98:17-22, 101:10-19.  The government's description of
the defendants' detainment is muddled.   In its response to the
defendants' motions the government first states that Holland and
Kelley were both arrested for the traffic violation under Atwater
v. City of Lago Vista, 121 S. Ct. 1536 (2001), and later states
that they were both "investigatively detained" under Terry.
Compare United States' Response to Defense Motions to Suppress
Firearms (Doc. 86) and Traffic Stop Evidence (Doc. 89)
("United States' Response Concerning the Traffic Stop"), Docket
Entry No. 92, p. 4, with id. at p.4 n.1.  Oppermann testified at
the hearing that the officers "detained" Holland "due to the
actions that [Oppermann] ended up seeing as [he] stopped him for
the [traffic violation] and due to the overall investigation and
the nature of it and what [Oppermann] believe[d] [was] taking
place," but later testified that Holland was immediately
"arrested," solely on the basis of the traffic violation.   Tr. of
Suppression Hr'g, Docket Entry No. 110, pp. 95:7-96:9.  Oppermann
testified that Kelley was merely detained away from the vehicle to
separate him from any weapons that might have been within reach.
Id. at 98:17-101:21, 107:14-109:6.   After the hearing, the
government in its supplemental briefing again argued that both
Holland and Kelley were arrested.   United States' Additional
Briefing in Opposition to Suppression, Docket Entry No. 117, p. 9.
The court concludes that Holland was arrested for the traffic
violation and Kelley was detained for officer safety.

discovered two firearms.[47]  "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 88 S. Ct. 507, 514 (1967) (footnotes omitted). Among the exceptions to the warrant requirement is a "search incident to a lawful arrest," see United States v. Robinson, 94 S. Ct. 467, 476–77 (1973).   The government contends that the search-incident-to-arrest exception validates the search of the center console.  This argument is unavailing, however, in light of the Supreme Court's recent decision in Arizona v. Gant, 129 S. Ct. 1710 (2009).

In Gant police officers arrested the defendant for driving with a suspended license when they encountered him during a narcotics investigation.   Id. at 1714-15.   After the officers arrested, handcuffed, and secured the defendant in the back of a patrol car, they searched the defendant's vehicle and discovered a bag of cocaine in the pocket of a jacket on the backseat.   Id. at 175.  The defendant, subsequently charged with two drug-related offenses, moved to suppress the evidence because "he posed no threat to the officers after he was handcuffed in the patrol car and because he was arrested for a traffic offense for which no evidence could be found in his vehicle."   Id.  Affirming the

_____

[47]Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 20:24-21:5.

-16-

Arizona Supreme Court, the Gant Court concluded that the search was unreasonable.  The Court had previously held in New York v. Belton, 101 S. Ct. 2860 (1981), that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."  Id. at 2864 (footnotes omitted).  Noting that Belton "has been widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search," the Gant Court rejected this broad interpretation and restricted the scope of such a search to situations where the "arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," id. at 1718–19, or where "it is reasonable to believe the vehicle contains evidence of the offense of arrest."  Id. at 1723–24.

Both Holland and Kelley had been handcuffed, patted down for weapons, and removed from the vicinity of their vehicle before Oppermann searched the center console.[48]  Moreover, at least five officers were at the scene helping secure the defendants, and Oppermann testified that neither defendant attempted to evade

---

[48]Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 92:1–100:25.  The court notes that the government's search-incident-to-arrest argument only applies to Holland since at the time of the search Kelley was merely detained, not arrested.  Id. at 98:1–25, 107:14–109:6.  But because a valid search incident to the arrest of Holland could potentially serve as a basis for the government's case against Kelley, the analysis is still relevant to Kelley.

detainment.  Oppermann stated that at the time of the search he did
not feel as if either defendant could have retrieved weapons from
the car or destroyed any evidence in the car.[49]  On these facts,
Oppermann "could not reasonably have believed" that Holland could
have accessed the car at the time he opened the console.  Id. at
1719.

The government's primary argument, however, is not that the
defendants could have accessed the vehicle but that it was
reasonable for Oppermann to believe the vehicle contained evidence
of the offense of arrest.  Oppermann testified, however, that the
only offense for which he had probable cause for the traffic stop
was the traffic violation — changing lanes without signaling — and
that Oppermann did not expect to find any evidence of the traffic
violation when he searched the console.[50]  Relying on Devenpeck v.
Alford, 125 S. Ct. 588 (2004), the government argues that the
relevant "offense of arrest" for this inquiry is conspiracy to
possess with intent to distribute a controlled substance, the crime
for which the defendants were later indicted, instead of the
traffic violation, and that the search is justified because

---

[49]Tr. of Suppression Hr'g, Docket Entry No. 110, p. 103:18-24.

[50]Id. at 82:4-17, 95:24-96:5, 109:14-19.  Interestingly, the
testimony elicited at the suppression hearing reflects that the
offense report stated that both defendants were arrested after the
search for being felons in possession of firearms and does not
state that the defendants were arrested before the search for a
traffic violation.  Id. at 189:18-190:8.

Oppermann was searching for evidence of the drug-conspiracy offense.[51]

The court is not persuaded that the holding in <u>Devenpeck</u> justifies Oppermann's search as a valid search incident to arrest as that concept is defined in <u>Gant</u>. In <u>Devenpeck</u> the Supreme Court held that an arrest is lawful, even if the stated basis for the arrest is flawed, if another basis exists that was supported by probable cause at the time of the arrest. <u>Id.</u> at 591, 593-94. In essence, an officer's "subjective reason for making the arrest" is "irrelevant." <u>Id.</u> at 593-94. Importantly, the issue in <u>Devenpeck</u> is limited to the constitutionality of an arrest and has nothing to do with the search-incident-to-arrest exception. Equally significant is the fact that <u>Gant</u>'s contouring of the search-incident-to-arrest exception never references <u>Devenpeck</u>. Oppermann's testimony makes clear that the only offense for which Holland was arrested on October 31, 2008, was the traffic violation.[52]   Accordingly, Oppermann's subsequent search of the center console, like the search in <u>Gant</u>, was not justified, especially in light of Oppermann's testimony that he did not expect to find any evidence of the traffic violation in the center console.[53]

---

[51]United States' Additional Briefing in Opposition to Suppression, Docket Entry No. 117, ¶¶ 10-20.

[52]Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 95:24-96:5.

[53]<u>Id.</u> at 109:14-19.

Under the government's theory, the search is valid because it was incident to the defendants' arrest for conspiracy, which occurred over a year after the arrest for the traffic violation.[54] The government provides no legal authority supporting such a broad reading of Gant or for its assertion that the parameters of the phrase "offense of arrest" as used in Gant are defined by the reasoning in Devenpeck.[55]  In fact, the Court in Gant explicitly explains that the idea to include searches for "evidence of the offense of arrest" within the permissible scope of searches incident to arrest was developed by Justice Scalia in his concurring opinion in Thornton v. United States, 124 S. Ct. 2127 (2004).  Gant, 129 S. Ct. at 1714 (citing Thornton, 124 S. Ct. at 2136–38 (Scalia, J., concurring in judgment)).  Justice Scalia's concurrence in Thornton, like the Court's opinion in Gant, bears no mention of Devenpeck.[56]

In sum, the government has not satisfied its burden to show that Oppermann's search of the center console was constitutionally permissible under the search-incident-to-arrest exception defined in Gant.

---

[54]See Execution of Arrest Warrant, Docket Entry No. 31.

[55]United States' Additional Briefing in Opposition to Suppression, Docket Entry No. 117, ¶¶ 11–12.

[56]Even if the court could conclude that the search was conducted incident to the arrest for the drug-conspiracy offense, the government has not demonstrated that evidence of that offense "might [have been] found" in the center console.  See Gant, 129 S. Ct. at 1714.  Before the search the officers were not aware of any narcotics, firearms, or contraband in the vehicle.  Id. at 90:5–24.

3.   The Evidence From the Search Is Not Admissible Under the Exclusionary Rule's Good-Faith Reliance Exception

The government argues that even if the evidence was unlawfully seized under Gant, it is admissible under United States v. Jackson, 825 F.2d 853 (5th Cir. 1987) (en banc), cert. denied, 108 S. Ct. 730 (1988), as an exception to the "exclusionary rule," because it was obtained pre-Gant by an officer acting in good-faith reliance on Fifth Circuit precedent.[57]

Ordinarily, the court's conclusion that Oppermann conducted an unlawful search incident to arrest would result in the suppression of that evidence under the exclusionary rule, which prohibits the government from using in a criminal proceeding evidence obtained in violation of the Fourth Amendment against the victim of the illegal search and seizure. United States v. Calandra, 94 S. Ct. 613, 619 (1974). But because the primary purpose of the exclusionary rule is to "deter future unlawful conduct," not repair it, id., the Supreme Court has decided to not apply the rule in certain limited circumstances, such as when a police officer acting in "objective good faith" relies on a search warrant that is subsequently invalidated, United States v. Leon, 104 S. Ct. 3405, 3419-20 (1984); or when an officer acts in objectively reasonable reliance on a statute, Illinois v. Krull, 107 S. Ct. 1160, 1166 (1987). The Fifth Circuit in Jackson extended the ambit of this exception to

_____

[57]United States' Additional Briefing in Opposition to Suppression, Docket Entry No. 117, ¶¶ 2-9.

-21-

include certain searches made in "good-faith reliance" on "Fifth Circuit law prior to the change of that law." Jackson, 825 F.2d at 854, 866.  The Fifth Circuit has not addressed whether, in light of Gant, its ruling in Jackson requires the application of the exception for all searches incident to arrest conducted pre-Gant in which the officer relied in good faith on Fifth Circuit law.[58]  The court need not resolve this overarching issue, however, to reach its conclusion that the exclusionary rule should apply in this case because there is no evidentiary support for the government's position that Oppermann was relying on a particular precedent or established law when he searched the center console.

Oppermann did not state that he was accustomed to searching the center console of a vehicle incident to the driver's arrest for a traffic violation after the driver was handcuffed in the back of a police car, or that he thought it was appropriate in this instance based on his training or from other officers' advice concerning the type of search he was permitted to conduct.[59]

_____

[58]Other circuits that have addressed this issue disagree on the appropriate answer, compare United States v. McCane, 573 F.3d 1037 (10th Cir. 2009) and United States v. Davis, 598 F.3d 1259 (11th Cir. 2010) (not excluding such evidence), with United States v. Gonzalez, 578 F.3d 1130 (9th Cir. 2009) (excluding such evidence), and the Supreme Court has granted certiorari on a case from the Eleventh Circuit to decide the issue with respect to officers who rely in good faith on well-settled precedent.  Davis v. United States, 131 S. Ct. 502 (2010) (mem.).

[59]The court recognizes the fine and often-blurred distinctions that exist between a search incident to arrest, which is grounded
(continued...)

Oppermann merely testified that he searched the center console because he had seen the defendants, through the Yukon's tinted windows, make "movements" "towards that compartment" as the defendants were being pulled over.[60]  Such testimony does not indicate that Oppermann was relying on a well-settled authority governing searches made incident to an arrest.  Instead, it indicates that Oppermann speculated that the defendants were in possession of firearms, and that he opened up the center console, even though he lacked probable cause, to determine whether his speculation was correct.

Moreover, although the government repeatedly argues that Oppermann's search incident to arrest was "made in good faith reliance on Fifth Circuit precedent,"[61] it has not explained which particular precedent would have validated Oppermann's search

---

[59](...continued)
in the probable cause that justified the arrest; a search for evidence in a vehicle relevant to offenses other than the offense of arrest, which is grounded in probable cause acquired apart from that justifying the arrest, see United States v. Ross, 102 S. Ct. 2157, 2171–72 (1982); and a protective search conducted in accordance with an investigative stop, which is grounded in an officer's reasonable belief that the suspect is presently dangerous, see Adams v. Williams, 92 S. Ct. 1921, 1923 (1972) (citing Terry, 88 S. Ct. at 1881).  Even though the government only argues that the search is valid as a search incident to arrest, the court's conclusion would be the same under any of the above theories.

[60]Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 98:1–99:23.

[61]United States' Additional Briefing in Opposition to Suppression, Docket Entry No. 117, ¶ 2.  See also id. ¶¶ 4, 6, 8.

incident to arrest, even if Oppermann had relied on it.  The
government merely states that "Gant restored to New York v.
Belton . . . Chimel's requirement that a search incident to arrest
cover only 'the space within an arrestee's immediate control,'"[62]
without applying Belton to the facts of this case.

Finally, even if it could be said that Oppermann's search
incident to arrest was justified under Belton at the time of the
search, and that Oppermann relied on Belton, the government has not
shown that Belton and its progeny establish a clear-cut precedent
that qualifies the search for the good-faith reliance exception
articulated in Jackson.  In Krull the Supreme Court applied the
exception when an officer searched an automobile wrecking yard in
reliance on a state statute that was subsequently declared
unconstitutional under the Fourth Amendment.  Krull, 107 S. Ct. at
1163-64.  The statute provided that a state official could inspect
the records of the scrap yard's operators "at any reasonable time
during the night or day" and could examine "the premises of the
licensee's established place of business for the purpose of
determining the accuracy of required records." Id. at 1163.  The
officer in Krull "regularly inspected the records of wrecking yards
pursuant to the state statute" and was acting in reliance on the
statute when he conducted the search at issue.  Id.

In Jackson the exception was applied when officers searched
the backseat area, trunk, and cases located inside the trunk during

--------

[62] Id. ¶ 5.

traffic stops at the Sierra Blanca checkpoint near the United States–Mexico border. See Jackson, 825 F.2d at 854; United States v. Jackson ("Jackson I"), 807 F.2d 1185, 1187–89 (5th Cir. 1986); United States v. Oyarzun, 760 F.2d 570, 572 (5th Cir. 1985). Fifth Circuit opinions before Jackson had given officers essentially carte blanche authority to conduct intrusive searches of vehicles at the Sierra Blanca checkpoint on the basis that the checkpoint was the "functional equivalent" of a border checkpoint. Jackson, 825 F.2d at 863 (explaining that the "functional equivalent" label empowered agents at permanent checkpoints to fully search vehicles without articulating any reason for the search, and dependent only on the discretion of those charged with the law enforcement function"); id. at 857 (citing Jackson I, 807 F.2d at 1190; Oyarzun, 760 F.2d at 576). The precedent permitting "complete searches" was limited to permanent checkpoints such as the Sierra Blanca checkpoint, see id., and the searches at issue occurred at the Sierra Blanca checkpoint, id. at 854.

Whatever precedent that can be gleaned from Belton is easily contrasted with the well-defined authorities that served as the basis for the officers' reliance in Krull and Jackson and that qualified those searches for the good-faith reliance exception. The Supreme Court in Belton held that when an officer lawfully arrests "the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger

compartment of the automobile" and any containers therein.  Belton,
101 S. Ct. at 2864 (footnotes omitted).  The Court also stated,
however, that its ruling "in no way alter[ed] the fundamental
principles established in the Chimel case regarding the basic scope
of searches incident to lawful custodial arrests."  Id. at 2864
n.3.  Chimel established that a search incident to arrest may only
include the arrestee's person and the area within his immediate
control.  Chimel, 89 S. Ct. at 2040.  Unlike the established
authorities in Krull and Jackson, Belton generated a wide variety
of opinions among the Courts of Appeals as to the appropriate scope
of a search incident to an arrest.  Gant, 129 S. Ct. at 1718.  In
other words, Belton did not provide a clearly defined scope of
permissible conduct such as supported the officers' conduct in
Krull and Jackson.  Furthermore, the notion that Oppermann was
operating under a  widespread reading of Belton is betrayed by the
fact that Fifth Circuit cases in fact reflected a limited inter-
pretation of Belton.  See id. at 1718 n.2 (citing United States v.
Green, 324 F.3d 375, 379 (5th Cir. 2003), and its holding that
"Belton did not authorize a search of an arrestee's vehicle when he
was handcuffed and lying face down on the ground surrounded by four
police officers 6-to-10 feet from the vehicle").  "Fifth Circuit
precedent" thus could not have justifiably served as the law on
which Oppermann relied in conducting the search.

    Accordingly, the court concludes that Oppermann was not
relying on legal precedent when he conducted the search of the

-26-

center console, and that even if it were determined that he was relying on <u>Belton</u>, such reliance would not justify the application of the good-faith reliance exception.

### 4.   The Search Is Not Justified Under the Inevitable-Discovery Rule

The government alternatively argues that the evidence from the search of the vehicle is independently admissible under the "inevitable-discovery" rule,[63] which "renders the exclusionary rule inapplicable to otherwise suppressible evidence if that evidence would inevitably have been discovered by lawful means." <u>United States v. Jackson</u>, 596 F.3d 236, 241 (5th Cir. 2010).  The inevitable-discovery rule applies if the government demonstrates by a preponderance of the evidence that (1) there is a reasonable probability that the contested evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation. <u>United States v. Zavala</u>, 541 F.3d 562 (5th Cir. 2008) (citing <u>United States v. Lamas</u>, 930 F.2d 1099, 1102 (5th Cir. 1991)).

The government argues that the evidence inside the vehicle would have been inevitably discovered during an inventory search, which would have occurred before the Yukon was towed.[64]  But there

---

[63]United States' Additional Briefing in Opposition to Suppression, Docket Entry No. 117, ¶ 21.

[64]<u>Id.</u> ¶ 22.

is no evidence that Oppermann or any other officer planned to impound the vehicle at the time of the search.  Cf. United States v. Seals, 987 F.2d 1102, 1108 (5th Cir. 1993) (holding that the inevitable-discovery rule applied since the record showed that before the unlawful search the officers "had already decided to impound the vehicle, and had begun the necessary paperwork").  Oppermann conceded that it was possible the officers would have released the vehicle to Kelley, who had not been arrested, and that such a determination would be "dependent on a lot of things."[65]  The government presents no evidence that an inventory search was required, or even authorized, under the circumstances.  The government's conclusion that the evidence "would have been discovered" through an inventory search is too speculative to warrant the application of the inevitable-discovery doctrine.  See Zavala, 541 F.3d at 581; United States v. Cherry, 759 F.2d 1196, 1205 n.10 (5th Cir. 1985) ("[T]he alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized.").

## C.    Conclusion

Because when Oppermann conducted the search of the center console both defendants were secured in handcuffs and seated in patrol cars, and because Holland and Kelley were detained for a

---

[65]Tr. of Suppression Hr'g, Docket Entry No. 110, p. 102:3-25.

traffic violation, the warrantless search was not a valid search incident to arrest and neither the good-faith-reliance rule nor the inevitable-discovery rule renders the evidence admissible. Therefore, the court will grant the defendants' motions, and any evidence seized from the vehicle will be suppressed pursuant to the exclusionary rule.

**III.   Motion to Suppress Evidence Seized from the Residence**

Kelley moves for the suppression of the search warrant issued for his residence and any evidence obtained as a result of the warrant's execution on the grounds that (1) an open-air sniff by a drug-detecting dog, which helped form the basis for the issuance of the warrant, constituted an illegal search; and (2) the supporting affidavit for the warrant lacked probable cause because it contained material false statements and material omissions.[66] Kelley bears the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his constitutional rights. Guerrero-Barajas, 240 F.3d at 432.

**A.   Legality of the Dog Sniff**

For police conduct to be classified as a "search" under the Fourth Amendment, it must offend "reasonable expectations of privacy." United States v. Lovell, 849 F.2d 910, 912 (5th Cir. 1988) (citing California v. Greenwood, 108 S. Ct. 1625, 1628

---

[66]Kelley's Brief, Docket Entry No. 114, pp. 18-33.

(1988)).  Kelley presents no persuasive authority to support his
argument that it is impermissible for the police to conduct an
open-air sniff with a trained drug-detecting dog outside a person's
garage.  In fact, the principles adopted by the Fifth Circuit and
in district courts within the Fifth Circuit with respect to dog
sniffs lead to the opposite result.

In United States v. Goldstein, 635 F.2d 356 (5th Cir. 1981),
the Fifth Circuit held that using a drug-detection dog to sniff
around the exterior of a person's luggage after it was removed from
an airline luggage cart was not an intrusion into a protected area.
Id. at 360-61; see also United States v. Place, 103 S. Ct. 2637,
2644-45 (1983) (commenting that a dog sniff is "limited both in the
manner in which the information is obtained and in the content of
the information revealed by the procedure").  The court stated that
a person's reasonable expectation of privacy that the contents of
his or her luggage will not be exposed without consent or a warrant
does not extend to "the airspace surrounding the luggage."  Id.
at 361.  The Fifth Circuit applied this same reasoning in holding
that a dog sniff of the exterior of a vehicle is also not a search.
United States v. Seals, 987 F.2d 1102, 1106 (5th Cir. 1993).
Although the Fifth Circuit has not addressed whether dog sniffs of
buildings should be treated similarly, district courts within this
Circuit have held that a protected "search" does not encompass dog
sniffs of the exterior of a commercial building, United States v.
Olivas, 2009 WL 2169893, at *6 (W.D. Tex. July 17, 2009); dog

sniffs of the front of a garage and alongside a private residence, United States v. Tarazon-Silva, 960 F.Supp.2d 1152, 1162 (W.D. Tex. 1997); or even dog sniffs outside the front door of a private residence, United States v. Cota-Lopez, 358 F.Supp.2d 579, 592 (W.D. Tex. 2002).  In accordance with the majority of courts in this circuit, the court concludes that conducting an open-air sniff outside Kelley's garage door was not a search that requires protection under the Fourth Amendment.

## B.  Sufficiency of the Supporting Affidavit for the Search Warrant

Kelley also argues that because the supporting affidavit for the search warrant contained material omissions, it was insufficient to establish probable cause and that the warrant and the evidence discovered pursuant to the warrant should thus be suppressed.[67]  A valid search warrant may be issued only upon a finding of probable cause.  United States v. Perez, 484 F.3d 735, 740 (5th Cir. 2007) (citing United States v. Brown, 941 F.2d 1300, 1302 (5th Cir. 1991)).  A probable-cause determination for the issuance of a search warrant is a "practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Cavazos, 288 F.3d 706, 710 (5th Cir. 2002) (quoting United States v. Byrd, 31 F.3d 1329, 1340 (5th Cir. 1994)).  A police officer

---

[67]Kelley's Brief, Docket Entry No. 114, pp. 30-34.

seeking the issuance of a search warrant must present an affidavit containing facts sufficient to "provide the magistrate with a substantial basis for determining the existence of probable cause." Kohler v. Englade, 470 F.3d 1104, 1109 (5th Cir. 2006) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983)). A magistrate's determination is entitled to deference by reviewing courts. Perez, 484 F.3d at 741. In analyzing a magistrate's decision to issue a search warrant, a court "start[s] with the general proposition that a search warrant, unlike an arrest warrant, may issue, without the slightest clue to the identity of the criminal, if there is probable cause to believe that the fruits, instrumentalities, or evidence of criminal activity are located at the place to be searched." United States v. Webster, 750 F.2d 307, 318 (5th Cir. 1984).

A Fourth Amendment violation may be established if the defendant proves, by a preponderance of the evidence, that the supporting affidavit for a search warrant contains a false, material statement made intentionally or with reckless disregard for the truth. United States v. Alvarez, 127 F.3d 372, 373-74 (5th Cir. 1997). If the defendant carries this burden, the court "must excise the offensive language from the affidavit and determine whether the remaining portion establishes probable cause." Id. (citing Franks v. Delaware, 98 S. Ct. 2674, 2684-85 (1978)). Likewise, if the defendant shows that the affidavit contained material omissions and that the material omissions were made

intentionally or with a reckless disregard for the accuracy of the affidavit, the court is required to determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause. See United States v. Martin, 615 F.2d 318, 328 (5th Cir. 1980); Kohler, 470 F.3d at 1113.

In this case, Officer Baker met with Officer Veliz of the HIDTA unit to assist in preparing an affidavit and a search warrant for Kelley's residence.[68]  In his affidavit Officer Baker testified that Officer Veliz "was conducting an investigation involving [the defendants]," that the defendants "were negotiating a purchase of cocaine from a confidential source," that "[s]urveillance was conducted on [the defendants]," that the defendants "were followed to [Kelley's residence]," that the defendants "were observed exiting the residence," that "surveillance was maintained at the residence after [the defendants] left in the Yukon," that "Detective Newton and his K-9 'Mike' arrived at [the residence]," that "'Mike' is certified by the National Narcotics Detector Dog Association" and is "certified in the detection of Marijuana, Cocaine, Methamphetamine, and Heroin," that "Detective Newton advised he used 'Mike' to conduct an open air sniff of the exterior of the residence which is accessible to the public," and that Mike alerted with his "trained response to the presence of the odor of

---

[68]Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 129:23-130:18.

-33-

narcotics" when he sniffed "the lower seam and handle of the garage door."[69]

Kelley contends that Officers Veliz and Baker "intentionally and knowingly omitted" that (1) all of the information concerning the alleged narcotics negotiations came from a CI and that Officer Baker had no corroborating information to support the CI's statements, and that (2) Mike, the drug-detection dog, was not certified to conduct an "open air" sniff.[70]  Kelley's assertion that all of the information about the narcotics negotiations came from a CI is not supported by the record.  Officer Veliz was a member of the HIDTA unit that had been conducting surveillance on the defendants throughout the day and had been visually monitoring the negotiations.  In some instances the magistrate may very well need information substantiating a CI's reliability to make a probable-cause determination, such as when officers seeking a warrant state merely that they received reliable information from a credible person or informant and not through their direct observations, or when they are acting only pursuant to an informant's tip.  See Gates, 103 S. Ct. at 2333-36.  But here,

---

[69]Affidavit for Search Warrant, Exhibit A to United States' Response to Defense Motion to Suppress Search Warrant, Docket Entry No. 93, p. 5.

[70]Kelley's Brief, Docket Entry No. 114, p. 31.  Kelley's argument that the officers materially omitted the fact that the two duffel bags found in the Yukon contained nothing but candy and clothes is irrelevant to the probable-cause determination because the affidavit does not mention that the defendants were seen carrying the two bags away from the residence.

Officer Baker's sworn statement in the affidavit that Officer Veliz was conducting an investigation and that the defendants were negotiating a purchase of cocaine from a confidential source stemmed from Officer Veliz's direct observations, thus negating the need for information corroborating the CI's reliability.

Furthermore, at the suppression hearing Officer Baker credibly testified that he knew Mike was certified because Mike's handler, Officer Newton, is a member of Officer Baker's narcotics squad.[71] Therefore, Officer Baker's sworn statement that Mike was a certified drug-detection dog was not speculative or intended to mislead the magistrate.  The court further concludes that based on Officer Newton's credible testimony, Mike was certified to make the open-air sniff of the exterior of Kelley's garage.  Mike had been certified to detect four narcotics odors, including cocaine, and when Officer Newton presented him to the front of Kelley's garage, Mike "pulled [Newton] towards the seam of the garage door and as he came to the . . . pillar that separates the two garage doors, he sniffed along the seam of the garage door and then sat," indicating the detection of a narcotics odor.[72]  Moreover, Mike's training logs contained multiple examples of training exercises that involved the type of sniff he conducted outside Kelley's garage.[73]  Lastly, other

---

[71]Tr. of Suppression Hr'g, Docket Entry No. 110, pp. 131:21–132:8.

[72]Id. at 143:13–146:5.

[73]Id. at 169:4–173:23.  See Training Logs, Exhibit K-14 to Kelley's Brief, Docket Entry No. 114.

than Kelley's assertions, there is nothing in the record that demonstrates that the standards used by the organization that issued the dog's certification are of sub-par quality.

## C.    Conclusion

Because the court concludes that the drug-detection dog's sniff of the exterior of Kelley's garage was not a "search," and that the supporting affidavit was sufficient to establish probable cause for the issuance of the search warrant, the court will deny Kelley's motion to suppress the warrant and the evidence seized pursuant to the warrant's execution.

## IV.   Motion to Suppress Oral Statements

Holland moves to suppress oral statements he made to state law-enforcement officers during a custodial interrogation on May 6, 2009, on grounds that (1) the officers did not advise him of his Miranda rights or obtain a valid waiver of those rights, and (2) the statements were made involuntarily as a result of promises and threats made by the officers.[74]

The court concludes that the officers advised Holland of his Miranda rights before they conducted their interrogation.  Officer Sanders credibly testified that he Mirandized Holland even though he forgot to turn on the microcassette that recorded the

---

[74]Holland's Motion to Suppress Oral Statements, Docket Entry No. 87, pp. 1-2.

interrogation until after he had already issued the warnings.[75]
Officer Vanderberry, one of the interrogating officers, testified
that he was in the room and could vouch for the fact that Holland
was advised of his <u>Miranda</u> rights.[76]   Holland's testimony to the
contrary was not credible.

The court also concludes that Holland voluntarily waived his
<u>Miranda</u> rights when he chose to answer the officers' questions.
Even though Holland did not invoke any of his <u>Miranda</u> rights, his
statement is still "inadmissible at trial unless the prosecution
can establish that the accused 'in fact knowingly and voluntarily
waived [<u>Miranda</u>] rights' when making the statement." <u>Berghuis v.
Thompkins</u>, 130 S. Ct. 2250, 2260 (2010) (quoting <u>North Carolina v.
Butler</u>, 99 S. Ct. 1755 (1979)).   A showing that a <u>Miranda</u> warning
was given and that the accused made an uncoerced statement is
sufficient, standing alone, to demonstrate a valid implied waiver
of <u>Miranda</u> rights.  <u>Id.</u> at 2261-62.  "The voluntariness determina-
tion is made on a case-by-case basis and is viewed under the
totality of the circumstances surrounding the interrogation."
<u>United States v. Cardenas</u>, 410 F.3d 287, 298 (5th Cir. 2005).

Holland argues that his statements were made involuntarily
based on Officer Sander's "promise" to withhold an aggravated
assault charge if Holland cooperated.   The aggravated assault
charge allegedly was based on the fact that Holland purposely

---

[75]Tr. of Suppression Hr'g, Docket Entry No. 110, 112:8-113:19.

[76]<u>Id.</u> at 125:5-126:2.

wrecked his car into the side of an undercover vehicle during the chase that resulted in his arrest.[77]  At the beginning of Holland's interrogation Officer Sanders stated:

> 'The D.A.'s office told me to file aggravated assault on you.  I think I might be able to work around that if we have a good discussion tonight.  You feel what I'm talking about?'[78]

Later, Officer Sanders stated:

> 'This is your opportunity to talk about whatever you might feel like you want to talk about.  Now, once we get you booked in, I won't have any control over the charges being filed and what happens with the charges.  You kind of get what I'm saying?  Like this aggravated assault thing, I can probably cut you a break on that tonight without going that route.  But if you want to talk, I'm listening.  You want to talk?'[79]

Holland responded, "What do you want to talk about?"[80]  From there, the officers and Holland began discussing the events surrounding Holland's drug-possession charge.

The court is not persuaded that Holland's statements made subsequent to the officer's comments about the aggravated assault charge were made because he was intimidated, coerced, or deceived.  See United States v. Rogers, 906 F.2d 189, 191 (5th Cir. 1990) (citing Moran v. Burbine, 106 S. Ct. 1135, 1141 (1986)).  Holland argues that these facts are identical to those in Rogers, in which the Fifth Circuit held that the accused's confession was not made

---

[77]Tr. of Suppression Hr'g, Docket Entry No. 110, p. 123:8-20.

[78]Id. at 120:5-8.

[79]Id. at 121:20-122:3.

[80]Id. at 122:10-11.

voluntarily.  Id. at 191-92.  The conclusion in Rogers, however, was based on the fact that the defendant was misled as to the purpose of the interrogation and the consequences of his statements.  The defendant was approached in his front yard by officers of the sheriff's department to talk about whether he was in possession of stolen guns.  Id. at 190.  The person who stole the guns was already in custody, and the defendant was assured that the officers were only interested in obtaining the guns and that he would not be charged with a criminal offense.  Id.  A couple of days later, a separate officer called the defendant into the sheriff's office, and because the defendant assumed the interview was a follow-up to the prior conversation, he gave self-incriminating statements that were the source of a three-count indictment.  Id.  The Fifth Circuit concluded that the defendant's statements were involuntary because he was "assured" he would not be arrested during the first conversation, relied on that assurance, and was led to believe that the second interview was related to the first interview.  Id. at 191.  Here, Holland was not promised anything.  Holland knew he had been arrested for a drug offense and had no reason to believe that incriminating statements he made about the drug offense would be free of consequences.  In fact, Officer Sanders' language - "your opportunity," "whatever you might feel like you want to talk about," "if you want to talk, I'm listening" - was not, under any reasonable construction, a message with coercive overtones.  Floating the possibility that if Holland

-39-

talked, an additional offense might not be tacked on to the drug offense does not amount to coercion, intimidation, or deception. Holland's motion to suppress his oral statements will therefore be denied.

### V.  Motion to Sever

Holland moves to sever the felon-in-possession count from the conspiracy and drug-trafficking counts.  Because the court has concluded that the firearms forming the basis of the felon-in-possession count against Holland will be suppressed, Holland's motion to sever that count will be denied as moot.

### VI.  Conclusion

For the reasons explained above, defendant Ezekiel Reed Holland's Motion to Suppress the Firearms (Docket Entry No. 86) and defendant Norris Fitzgerald Kelley's Motion to Suppress Evidence (Docket Entry No. 89) are **GRANTED**, Kelley's Motion to Suppress (Docket Entry No. 90) and Kelley's Supplemental Motion to Suppress Search Warrant (Docket Entry No. 95) are **DENIED**, Holland's Motion to Suppress Oral Statements (Docket Entry No. 87) is **DENIED**, and Holland's Motion to Sever the Felon-in-Possession Count (Docket Entry No. 85) is **DENIED as moot**.

**SIGNED** at Houston, Texas, on this 20th day of January, 2011.

_____
SIM LAKE
UNITED STATES DISTRICT JUDGE